UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

CALIFORNIA STATE UNIVERSITY
FULLERTON FOUNDATION,
                    *Plaintiff-Appellant,*

v.

NATIONAL SCIENCE FOUNDATION; RITA
R. COLWELL, Director, National
Science Foundation,
                    *Defendants-Appellees.*

No. 01-1470

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(CA-00-654-A)

Argued: October 30, 2001

Decided: January 22, 2002

Before WIDENER, TRAXLER, and KING, Circuit Judges.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** James Leo Feldesman, FELDESMAN, TUCKER,
LEIFER, FIDELL & BANK, L.L.P., Washington, D.C., for Appel-
lant. Gerard John Mene, Assistant United States Attorney, Alexan-
dria, Virginia, for Appellees. **ON BRIEF:** Kathy S. Ghiladi,
FELDESMAN, TUCKER, LEIFER, FIDELL & BANK, L.L.P.,

Washington, D.C., for Appellant. Kenneth E. Melson, United States Attorney, Alexandria, Virginia, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

After the National Science Foundation ("NSF" or "the agency") determined that the California State University Fullerton Foundation ("the Foundation") owed it a refund of some of the money NSF provided the Foundation pursuant to a grant, the Foundation filed an action in federal district court seeking a declaration that it owed no refund and an injunction prohibiting NSF from making collection efforts. The district court granted NSF's summary judgment motion, thus denying the Foundation's requested relief, and the Foundation timely appealed. We affirm.

I.

In 1993, the Advanced Research Projects Agency ("ARPA") of the Department of Defense, together with other federal agencies, including the NSF, collaborated in a Technology Reinvestment Project ("TRP"). The TRP was designed to further eight statutory programs authorized by the Defense Conversion, Reinvestment, and Transition Assistance Act of 1992 ("the Act"), Pub.L. No. 102-484, §§ 4001-4501, 106 Stat. 2315, 2658-770 (1992). One of the primary purposes of the TRP and the Act was to expand employment opportunities for displaced defense industry workers.

In March 1993, the TRP issued a "Program Information Package for Defense, Technology Conversion, Reinvestment and Transition Assistance," J.A. 17, describing the eight TRP programs and the specific grants available for each. ARPA later issued a "Joint Program

Solicitation", J.A. 17, in which it formally solicited proposals for projects to be undertaken pursuant to the TRP. The solicitation required all project proposals to contain TRP cover sheets, a technical proposal, and a cost proposal. The solicitation further required all cost proposals to be divided into three sections: (1) "Total Proposed Cost"; (2) "Cost to the Government"; and (3) "Fund Matching and In-Kind Contributions". J.A. 19. The solicitation required the matching funds category to be divided into three subsections: "(1) the sources of cash and amounts to be used for matching requirements, (2) the specific in-kind contributions proposed, their value in monetary terms, and the methods by which their values were derived, and (3) evidence of matching fund availability." J.A. 19.

The Foundation, a private, non-profit foundation established under California law to manage certain activities on behalf of California State University, Fullerton, submitted a grant proposal under the Manufacturing Engineering Education program described in the solicitation. The Foundation named the proposed project the "Integrated Environmental Training Program for Defense Industry Engineers," J.A. 256, and otherwise referred to the program as Project INTENT. The Foundation designed the project in order to retrain up to ninety defense engineers for environmentally related, dual-use capacity employment in small businesses, with an emphasis on manufacturing. To this end, the Foundation proposed a two-step project. The first step involved recruiting twenty-five to thirty engineers annually for three years and providing them with a one-month orientation to environmental careers and the university and then providing them several intensive two-month seminars. When the classwork ended, the Foundation proposed to provide the engineers six-month externships with mentors in environmentally sensitive industries as the second step of the project.

In the required cost proposal section, the Foundation estimated that the project would cost $1,179,544. Of this amount, the Foundation sought $593,166 in federal funding from NSF and proposed to match that with $586,378 from other sources. The bulk of the non-federal money was to come from industry during the on-the-job externships. The cost proposal estimated that industry would contribute $96,000 annually for wages for the externships. The Foundation proposal also estimated that $20,000 of in-kind contributions would be made annu-

ally by the advisory board, and roughly $35,000 of in-kind contributions would be made annually by the faculty designated to work on the project.

NSF awarded the Foundation a $550,000 grant based on the proposal. Under the terms of the award letter, the Foundation "agree[d] to share in the costs of the project in the amount of $583,507, including industry share." J.A. 323. The award letter declared that the Foundation was "responsible for documenting and maintaining all cost sharing records for a period of three years after the expiration date of the award" and required "[d]ocumentation of matching funds and a breakdown of that matching support by source, by type . . ., and by allocation to the functions of the project, certified by an authorized organizational representative, [to] be included with the annual TRP progress report." J.A. 323-24.

The GC-1 Grant General Conditions ("the Conditions"), to which the grant was explicitly made subject in the award letter, contained several noteworthy provisions. With regard to cost sharing, the Conditions provided that "[t]he grantee must cost share under this grant in accordance with any specific requirements contained in or referenced by the grant," and "must maintain records of all project costs that are claimed by the grantee as cost sharing." J.A. 353. Also, the Conditions provided that the grant could be suspended or terminated, in whole or in part, if, among other reasons, the NSF believed that the grantee had materially failed to comply with the terms and conditions of the grant or if the NSF had other reasonable cause.

Sometime before the grant period expired, NSF became concerned about the Foundation's ability to meet its cost sharing obligations. As a result of its dissatisfaction with the actual implementation of Project INTENT and the Foundation's apparent inability to meet its obligations under the grant documents, NSF set an early termination date of January 31, 1997. By letter dated November 25, 1996, Stuart Ross, Director of the University's Office of Faculty Research and Development, indicated that the Foundation would not seek to continue the grant beyond that date. Furthermore, after acknowledging that much of the anticipated cost sharing did not materialize, Ross requested that NSF "work with [the Foundation] on finding a way to account for the cost sharing that will accommodate our difficult situations and still

satisfy NSF's audit needs." J.A. 401. The letter made suggestions about how to accomplish that goal.

On September 17, 1998, NSF's Office of Inspector General ("OIG") completed a draft Audit Report relating to Project INTENT. Several of the findings raised concerns about the effort put into the project. The audit also noted problems with the externship aspect of the program and with the cost sharing data provided by the Foundation. With regard to the cost sharing data, the audit found that when the paid externships that were to comprise industry's matching contribution to Project INTENT failed to materialize, the Foundation unilaterally decided to claim as industry's contribution twenty-five percent of the salaries paid to fellows[1] who obtained full-time jobs "even though the employers were not involved with Project INTENT and most of the jobs were not in the environmental field." J.A. 265. When it became clear that these substitutions were not acceptable to the agency, the Foundation contacted the employers of all fellows who had obtained jobs or participated in externships and asked them to estimate the cost of supervising those persons. The Foundation then submitted these amounts as cost sharing in the final report.

OIG also found that although key organizational personnel had signed certifications that the cost sharing requirements had been met, those reports actually contained inaccurate information that the signers had not attempted to verify. Because the progress reports and cost sharing certifications were material to NSF's decision to continue funding of Project INTENT, OIG referred the matter to the appropriate United States Attorney's Office.

Ultimately, OIG questioned $308,858 of the $527,240 the Foundation finally claimed in cost sharing. The majority of the contested amount ($206,410) consisted of claims for "supervisory training costs for externships." J.A. 266. The audit recommended that NSF require the Foundation to repay $148,291.[2] The Foundation responded to the

---

[1]The displaced defense engineers that participated in the program were referred to as "fellows."

[2]OIG essentially reached this amount by taking the actual cost of the project, dividing by two and subtracting its half of the total costs from the amount it actually provided the Foundation.

draft Audit Report and basically contested the factual bases upon which NSF had decided to disallow certain costs. NSF reviewed the audit and sustained the finding.

The Foundation again responded, arguing this time that the refund determination was based on an incorrect interpretation of the cost-sharing provision of the authorizing legislation. NSF stood its ground, sustaining the decision of the reviewing office with a few minor modifications. As a result of those modifications, it determined that the Foundation owed NSF $139,152.

Pursuant to the Administrative Procedure Act, 5 U.S.C.A. § 701-706 (West 1996) ("the APA"), the Foundation then filed the instant action for declaratory and injunctive relief. The parties filed cross motions for summary judgment. The district court granted NSF's motion, effectively sustaining the agency's refund determination, and the Foundation timely appealed.

## II.

This Court reviews a grant of summary judgment de novo. *See Higgins v. E.I. DuPont de Nemours & Co.*, 863 F.2d 1162, 1167 (4th Cir. 1988). Summary judgment is appropriate if there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). This Court must view the evidence in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Central to this case is the interpretation by the NSF and the district court of the terms of the grant agreement. An NSF grant agreement "establishes what would commonly be regarded as a contractual relationship between the government and the grantee." *Henke v. United States Dep't of Commerce*, 83 F.3d 1445, 1450 (D.C. Cir. 1996). The question we are presented with is whether, under the terms of the grant, the Foundation was contractually obligated to share in the cost of Project INTENT, such that it is now obliged to refund all amounts NSF paid in excess of its half. Under the APA, when the "essential question" is one of contract interpretation, as it is in this case, the

question is "a question of law . . . which we review de novo." *Burgin v. Office of Pers. Mgmt.*, 120 F.3d 494, 497-98 (4th Cir. 1997).

The Foundation's sole contention is that, with regard to cost sharing, the grant contract merely incorporated the standard of the statute authorizing the grant. The statute provides that, with respect to federal support, "[t]he amount of financial assistance furnished to an institution . . . may not exceed 50 percent of the estimated cost" of the project. 10 U.S.C.A. § 2196(k) (West 1998). Under this statutory standard, which the Foundation contends is the sole term in the contract that defines the parties' cost sharing obligations, the Foundation reasons that because NSF did not provide more than fifty percent of the estimated cost of the project, both the agency and the district court erred in determining that the Foundation owed NSF a refund.

Like the district court, we are unable to find support for this argument. We have no problem with the Foundation's contention that the grant contract incorporated the statutory standard set forth above. The problem is that that standard does nothing more than set a limit on the amount of funding NSF is authorized to provide. It simply does not speak to the fact that the Foundation contractually agreed to share costs in the amount of $583,507, an amount that represented just over half of the estimated costs of the project. Nor does the Foundation argue that it satisfied its obligation in that regard. As a result of the Foundation's breach of its obligation to share costs in the amount of $583,507, the agency sought a partial refund of the money it provided to the Foundation so that the final amounts expended by each party approximated that party's pro rata share as reflected in the award letter. As we see it, NSF was well within its contractual rights to seek that relief, and we do not see how the statutory cap on NSF's spending bears on the issue of the Foundation's cost-sharing obligations when the award letter unequivocally stated that as a condition of receiving the grant, the Foundation had to "agree to share in the costs of the project." J.A. 323. Because that is the only argument the Foundation raises on appeal, and because we find it meritless, we affirm the district court's order granting summary judgment to NSF.

*AFFIRMED*