**UNITED STATES of America,**
**Plaintiff,**

v.

**THE MIAMI UNIVERSITY, and**
**The Ohio State University,**
**Defendants,**

**and**

**The Chronicle of Higher Education,**
**Intervenor–Defendant.**

**No. C–2–98–0097.**

United States District Court,
S.D. Ohio,
Eastern Division.

March 20, 2000.

Deborah F. Sanders, United States Attorney's Office, Columbus, OH, Frank W. Hunger, Assistant Attorney General Civil Division, U.S. Department of Justice, Washington, DC, for Plaintiff.

Gerald Linden Draper, Roetzel & Andress, Columbus, OH, Adam Edward Scurti, King Hargrave Scurti & Jack, Steubenville, OH, Edward N. Stoner, II, Reed, Smith, Shaw & McClay, Pittsburgh, PA, for Kenneth A. Zirm, Ohio Attorney General, Assistant Attorney General, Marc David Mezibov, Sirkin Pinales Mezibov & Schwartz, Ted L. Wills, Cincinnati, OH, for Defendants.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

### I. Introduction

Plaintiff, United States of America ("United States"), commenced this action on January 22, 1998, suing on its own behalf and on behalf of the United States Department of Education ("Department"). The Complaint alleges that Defendants, The Miami University and The Ohio State University ("Defendants"), violated the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, by releasing student disciplinary records containing personally identifiable information without the prior consent of the students or their parents. Plaintiff also claims that Defendants have a policy or practice of releasing such records and that Defendants intend to continue releasing such records in the future. Plaintiff sought relief in the form of a declaratory judgment, and preliminary and permanent injunctions.

On February 12, 1998, the Court issued a preliminary injunction prohibiting Defendants from releasing student disciplinary records that contain "personally identifiable information," except as otherwise expressly permitted under FERPA. Subsequently, the Court permitted *The Chronicle of Higher Education* ("Intervenor" or *"The Chronicle"*), a national weekly newspaper covering issues regarding higher education, to intervene as a defendant in this action.

Since intervening, *The Chronicle* has filed a motion to dismiss for lack of subject matter jurisdiction, and a motion for an order of procedure establishing a period for discovery and permitting an evidentiary hearing on the merits. In response, Plaintiff has moved for summary judgment and a permanent injunction.

For the reasons that follow, *The Chronicle's* Motion to Dismiss and its Motion for an Order of Procedure are denied. Plaintiff's Motion for Summary Judgment is granted.

## II. Facts

The circumstances giving rise to the instant case find their genesis in *State ex. rel. The Miami Student v. Miami University*, 79 Ohio St.3d 168, 680 N.E.2d 956 (1997), an Ohio Supreme Court decision addressing, inter alia, the scope of the term "education records" under FERPA. In *Miami University*, the university student newspaper, *The Miami Student*, requested records of Miami University's student disciplinary proceedings. Miami University initially refused to release the records, and subsequently, the newspaper made a formal request under the Ohio Public Records Act, Ohio Rev.Code § 149.43. *See id.* at 957.

In April 1996, Miami University released redacted copies of some of its disciplinary records. Relying on FERPA, it deleted the name, sex and age of the accused students, as well as the date, time and location of the incidents giving rise to the disciplinary charges. *See id.* The student newspaper was not satisfied with the redacted copies. It believed that the Ohio Public Records Act required Miami University to provide it with complete copies of the disciplinary records, with only names and social security numbers or student identification numbers redacted. *See id.* Consequently, the newspaper filed an original mandamus action in the Ohio Supreme Court, seeking a writ compelling the university to disclose the disputed records pursuant to the Ohio Public Records Act. *See id.*

The Ohio Supreme Court issued its decision on July 9, 1997, granting a writ of mandamus compelling the university to disclose its student disciplinary records. *See id.* at 960.[1] In reaching this result, the court held that FERPA did not apply to student disciplinary records. *See id.* at 959. Specifically, the court concluded that student disciplinary records are not "education records" as defined in FERPA because disciplinary records "do not contain educationally related information, such as grades or other academic data, and are unrelated to academic performance, financial aid, or scholastic performance." *Id.* at 958–59.[2]

Soon after the Ohio Supreme Court issued its decision, Defendants received requests from *The Chronicle* to release student disciplinary records for the years 1995 and 1996, with no redactions. (Doc. 7 and Ex. A attached thereto; May 19, 1998, Appendix of Intervenor, Doc. No. 6). On July 21, 1997, after receiving *The Chronicle*'s request, Miami University notified the Department of Education that it "may be unable to comply with the Family Educational Rights and Privacy Act due to a potential conflict with state law[,]" namely the Ohio Public Records Act. The Department responded to Miami University by letter dated August 7, 1997. The letter stated that the Department believed that student disciplinary records are "education records" as defined by FERPA, and thus, it would be a violation of federal law for

---

1. The court did not force the university to disclose the names, social security numbers, or student identification numbers of the accused or convicted students because the newspaper had not sought disclosure of this information in its original requests. *See id.* at 959.

2. FERPA defines "education records" as those records, files, documents, and other materials which—
 (i) contain information directly relating to a student; and
 (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution.

20 U.S.C. § 1232g(4)(A). In reaching its holding in *Miami University*, the Ohio Supreme Court adopted the reasoning of the Georgia Supreme Court, which had addressed nearly the same issue in *Red & Black Publishing Co. v. Board of Regents*, 262 Ga. 848, 427 S.E.2d 257 (1993). The Ohio Supreme Court did not apply any principles of statutory construction regarding FERPA, nor did it indicate why the substantially broad definition of "education records" contained in FERPA must be limited to "educationally related" or "academic" information.

Miami University to release student disciplinary records or any personally identifiable information contained therein without the student's prior consent. (Doc. 3 and Ex. A attached thereto).

On September 5, 1997, general counsel for Miami University informed the Department that it would appeal the Ohio Supreme Court's decision in *Miami University* to the United States Supreme Court. (Compl. ¶ 10; Doc. 3 and Ex. A attached thereto). The United States Supreme Court, however, denied the petition for *certiorari* on December 8, 1997. *See* 522 U.S. 1022, 118 S.Ct. 616, 139 L.Ed.2d 502 (1997). This prompted Miami University to accommodate *The Chronicle*'s previous request for disciplinary records by releasing such records for the months of November 1995 and November 1996, redacting only student social security numbers. (Doc. 3 and Ex. A attached thereto). Moreover, Miami University informed the Department that it intended to provide *The Chronicle* with copies of the remainder of its student disciplinary records from 1995 and 1996. (Doc. 3 and Ex. A attached thereto).

On January 7, 1998, the Department learned from counsel for The Ohio State University that *The Chronicle* also had requested student disciplinary records from OSU, and that on December 22, 1997, OSU had released its student disciplinary records from November 1995 and November 1996. Furthermore, on January 16, 1998, OSU informed the Department that *The Chronicle* had requested the remainder of its disciplinary records from 1995 and 1996, and that OSU intended to comply with that request. (Id.).

Consequently, the Department filed the instant action and a motion for a preliminary injunction on January 23, 1998. At a conference regarding the motion for a preliminary injunction, Plaintiff and Defendants agreed that the facts in this case are not in dispute, and that an evidentiary hearing is not required. Furthermore, during a telephonic status conference with the parties, Defendants' counsel indicated that unless enjoined, Defendants intended to continue to release their respective disciplinary records. On, February 12, 1998, the Court issued a preliminary injunction prohibiting the release of student disciplinary records and personally identifiable information contained therein, except as expressly permitted under FERPA. That injunction is still in force.

### III. Motion to Dismiss

As an initial matter, *The Chronicle* moves this Court to dismiss the instant action pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction. More specifically, it argues that the United States lacks standing to bring this action.

### A. Rule 12(b)(1) Standard

For purposes of ruling on a motion to dismiss for lack of standing pursuant to Rule 12(b)(1), the court must view the complaint in the light most favorable to the plaintiff and must accept as true all material allegations in the complaint. *See Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). "Plaintiff's, however, bear the burden of persuading the court that it has subject matter jurisdiction." *American Fed. of Govt. Employees v. Clinton*, 180 F.3d 727, 729 (6th Cir.1999).

### B. Standing

A party seeking relief in federal court must have standing to sue in order for the federal court to have jurisdiction over the matter. *See Kardules v. Columbus*, 95 F.3d 1335, 1346 (6th Cir.1996). The concept of standing derives from the mandate in Article III of the United States Constitution that federal courts adjudicate only "cases" or "controversies". *See* U.S. Const. Art. III, § 2, cl. 1; *Allen v. Wright*, 468 U.S. 737, 750–51, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Standing involves both constitutional and prudential dimensions. *See Warth v. Seldin*, 422 U.S. at 498, 95 S.Ct. 2197.

■ From a constitutional standpoint, a plaintiff must satisfy, at a minimum, three requirements in order to establish standing:

> First, the Plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical[.]' " Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations and footnotes omitted) (brackets in original).

■ The issue before this Court is whether the Department of Education has standing, either statutorily or otherwise, to bring this action against Defendants, The Ohio State University and Miami University.[3] For the reasons that follow, the Court holds that the Department does have standing to bring this action for injunctive and declaratory relief.

**3.** The United States filed this action on its own behalf and on behalf of the United States Department of Education. (Compl.¶ 2). Both the United States and the Department of Education are "real parties in interest" under Rule 17(a) of the Federal Rules of Civil Procedure. The Department is a proper party because it is the entity authorized to enforce the provisions of FERPA. *See* 20 U.S.C. §§ 1232g(f) and 1234c. The United States is a proper party because the law permits the United States to sue in its own name even though a federal agency could have proceeded independently. *See United States v. Stuart*, 392 F.2d 60, 63–64 (3d Cir.1968); *United States v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 841 F.Supp. 899, 906 (D.Minn.1993); *United States v. Lasco Indus.*, 531 F.Supp. 256, 260 (N.D.Tex.1981); *United States v.*

## 1. Plain Language and Purpose of the Statute

■ It is well settled that when an agency is acting pursuant to a statute, that agency "has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986); *see also Houston Oil & Refining, Inc. v. United States Fed. Energy Regulatory Comm'n*, 95 F.3d 1126, 1135–36 (Fed.Cir.1996); *Friends of Crystal River v. United States Environ. Protection Agency*, 35 F.3d 1073, 1079–80 (6th Cir. 1994); *Walker v. Luther*, 830 F.2d 1208, 1211 (2d Cir.1987) ("As a matter of statutory construction, statutes granting power to administrative agencies are strictly construed as conferring only those powers granted expressly or by necessary implication.").

*The Chronicle*, together with Amici in Opposition to Plaintiff,[4] argue that the Department and the United States have no standing to bring this suit for declaratory and injunctive relief because Congress has not conferred such authority upon them, and because they are bound by the administrative remedies enumerated in the act and its corresponding regulations. The Court, therefore, must interpret the language of FERPA and related provisions to determine whether the Department does in fact have express authority to bring this action.

*Techno Fund, Inc.*, 270 F.Supp. 83, 84–85 (S.D.Ohio 1967); *see also* 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1553 (2d ed. 1990) ("Most of the courts that have faced this question have held that even though the agency might have proceeded on its own behalf, the United States is also a real party in interest.").

**4.** Amici in opposition to plaintiff are: (1) Student Press Law Center; (2) the Reporter's Committee for Freedom of the Press; (3) the Society of Professional Journalists; (4) the Ohio Coalition for Open Government; (5) *The Miami Student*; and (6) The Ohio State University *Lantern*. Together, these parties filed an Amicus Brief opposing the United States' request for injunctive relief.

■ "It is axiomatic that '[t]he starting point in every case involving construction of a statute is the language itself.' " *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 685, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985) (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (Powell, J., concurring)). A statute's plain language must ordinarily be regarded as conclusive, unless there exists a clearly expressed legislative intention to the contrary. *See Parker–Hannifin v. Commissioner of Internal Revenue,* 139 F.3d 1090, 1095 (6th Cir.1998); *Walker,* 830 F.2d at 1210.

Applying this principle to the instant case, the Court finds that the plain meaning of the statutory text at issue here confers authority upon the Department to file a civil action to enforce the provisions of FERPA. The express language of FERPA states:

> [T]he Secretary [of Education] shall take appropriate actions to enforce this section and to deal with violations of this section, in accordance with this chapter, except that actions to terminate assistance may be taken only if the Secretary finds there has been a failure to comply with this section, and he has determined that compliance cannot be secured by voluntary means.

20 U.S.C. § 1232g(f). The statutory scheme provided for FERPA's enforcement is further set forth at 20 U.S.C. § 1234c, as follows:

> § 1234c. Remedies for existing violations
>
> (a) Whenever the Secretary has reason to believe that any recipient of funds under any applicable program is failing to comply substantially with any requirement of law applicable to such funds the Secretary may—
>
> (1) withhold further payments under that program, as authorized by section 1234d of this title;
>
> (2) issue a complaint to compel compliance through a cease and desist

order of the Office, as authorized by section 1234e of this title;

> (3) enter into a compliance agreement with a recipient to bring it into compliance, as authorized by section 1234f of this title; or
>
> (4) *take any other action authorized by law with respect to the recipient.*
>
> (b) Any action, or failure to take action, by the Secretary under this section shall not preclude the Secretary from seeking a recovery of funds under section 1234a of this title.

20 U.S.C. § 1234c (emphasis added).

By including the phrase, "take any other action authorized by law with respect to the recipient[,]" Congress intended to provide the Secretary of Education with broad powers to effectuate and enforce the provisions of FERPA, including the power to file civil actions in federal court. A civil action seeking injunctive relief is a common method for enforcing rights and obligations arising under federal law. Thus, it follows that this lawsuit is an "action authorized by law" as stated in § 1234c.

Furthermore, reference to other federal case law supports the Court's finding that the language in § 1234c(a)(4) authorizes the Secretary of Education to file federal actions. Several federal courts have construed similar language in other federal statutes as authorizing agencies to file enforcement actions in federal court. *See United States v. Baylor Univ. Med. Ctr.,* 736 F.2d 1039, 1050 (5th Cir.1984) (interpreting enforcement provisions of the Rehabilitation Act, 29 U.S.C. § 794), *cert. denied,* 469 U.S. 1189, 105 S.Ct. 958, 83 L.Ed.2d 964 (1985); *National Black Police Assoc. v. Velde,* 712 F.2d 569, 575–76 (D.C.Cir.1983) (interpreting enforcement provisions of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d–1), *cert. denied,* 466 U.S. 963, 104 S.Ct. 2180, 80 L.Ed.2d 562 (1984); *Brown v. Califano,* 627 F.2d 1221, 1225, 1227–29, 1232–33 n. 67 (D.C.Cir.1980) (interpreting enforcement provisions of Title VI); *United States v. Marion County Sch. Dist.,* 625

F.2d 607, 612–13 (5th Cir.1980) (interpreting the enforcement provisions of Title VI), *cert. denied,* 451 U.S. 910, 101 ·S.Ct. 1980, 68 L.Ed.2d 298 (1981); *United States v. City of Denver,* 927 F.Supp. 1396, 1400 (D.Col.1996) (interpreting enforcement provisions of Title VI as applied to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, et seq.)

For example, Title VI of the Civil Rights Act of 1964, which is codified at 20 U.S.C. § 2000d–1, prohibits discrimination on the grounds of race, color, or national origin under any program receiving federal financial assistance. Moreover, 42 U.S.C. § 2000d–1 provides that each department or agency that is empowered to effectuate the provisions of Title VI may ensure compliance, "(1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record ... or (2) *by any other means authorized by law.*" 42 U.S.C. § 2000d–1 (emphasis added).

In *National Black Police Assoc. v. Velde,* 712 F.2d 569 (D.C.Cir.1983), *cert. denied,* 466 U.S. 963, 104 S.Ct. 2180, 80 L.Ed.2d 562 (1984), several African–American and women police officers filed a lawsuit against various federal agencies and officials. The police officers alleged that the agencies had violated the officers' constitutional and statutory rights, including Title VI, by failing to terminate federal funding to local law enforcement agencies that used funds to discriminate on the basis of race and sex. *Id.* at 572. The court had to determine whether the federal agencies and officials were protected from liability by qualified immunity. The standard for qualified immunity required the court to determine whether the federal officials' "failure to terminate funding to local law enforcement agencies violated statutory or constitutional duties clearly established at the time the failure occurred." *Id.* at 574.

The court, in holding that Title VI did not impose a clear statutory duty regarding termination of funding, made the following statements:

> Compliance with any requirement adopted pursuant to [Title VI] may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirements, ... or (2) by any other means authorized by law. Appellants contend that this provision imposed on appellees a clear duty to terminate funds to agencies that unlawfully discriminate.
>
> On its face, however, the statutory language is not mandatory. Section 2000d–1 allows the funding agency to effect compliance through funding termination or "any other means authorized by law." Although fund termination was envisioned as the primary means of enforcement under Title VI, and although it has proven very effective as a deterrent to discrimination, Title VI clearly tolerates other enforcement schemes. *Prominent among these other means of enforcement is referral of cases to the Attorney General, who may bring an action against the recipient.* The choice of enforcement methods was intended to allow funding agencies flexibility in responding to instances of discrimination. Faced with this statutory discretion, we cannot say that appellees' failure to terminate funding violated a clearly established statutory duty under Title VI.

*Id.* at 574–76 (citations omitted) (emphasis added); *see also United States v. Baylor Univ. Med. Ctr.,* 736 F.2d 1039, 1050 (5th Cir.1984) (stating that in enforcing Section 504 of the Rehabilitation Act, a federal agency does not have to resort solely to administrative remedies because the statute expressly states "any agency may resort to 'any other means authorized by law'—including the federal courts"), *cert. denied,* 469 U.S. 1189, 105 S.Ct. 958, 83 L.Ed.2d 964 (1985); *Brown v. Califano,*

627 F.2d 1221, 1225, 1227–29, 1232–33 n. 67 (D.C.Cir.1980) (noting several times that the language "by any means authorized by law" gave the Department of Health, Education and Welfare the authority to refer Title VI violations to the Department of Justice with a recommendation for appropriate legal action); *United States v. Marion County Sch. Dist.*, 625 F.2d 607, 612–13 (5th Cir.1980) (stating that the phrase "by any other means authorized by law" and the legislative history addressing that phrase indicate Congress' intent to authorize government suits to enforce contractual assurances to comply with Title VI), *cert. denied*, 451 U.S. 910, 101 S.Ct. 1980, 68 L.Ed.2d 298 (1981); *United States v. City of Denver*, 927 F.Supp. 1396, 1400 (D.Col.1996) ("Courts have interpreted the words 'by any other means authorized by law' to mean that a funding agency, after finding a violation and determining that voluntary compliance is not forthcoming, could refer the matter to the Department of Justice to enforce the statute's nondiscrimination requirement in court.").[5]

The consistency with which other courts have interpreted the phrase "any other means authorized by law," or similar phrases, as authorizing agencies to file enforcement actions in federal court suggests that Congress must have intended such language in § 1234c(a)(4) to have the same meaning. Accordingly, the above–cited cases support the conclusion that § 1234c(a)(4) authorizes the United States and the Department to file suit in federal court to enforce FERPA.

An inquiry into the purpose of FERPA also supports the Court's conclusion that the Department and the United States have standing to bring this action. The purpose of FERPA is: (1) to create a right of access to student records for parents and students; and (2) to protect the privacy of those records by preventing unauthorized access by third parties. *See* 120 Cong.Rec. 39,858, 39,862–39,863 (December 13, 1974); 121 Cong.Rec. 7974 (May 13, 1975); *see also Belanger v. Nashua New Hampshire School Dist.*, 856 F.Supp. 40, 47 (D.N.H.1994). Without the ability to file lawsuits in federal court, the Department is left without a meaningful remedy by which to accomplish FERPA's purpose; the primary remaining enforcement mechanism would be withdrawal of funding to any educational institution that violates FERPA. Such a harsh remedy would serve as a significant financial blow to universities and other institutions, and potentially could cause a decrease in the level of education. In the long-run, the students attending these institutions and their parents—the parties whom FERPA was intended to protect—would be the ones most penalized by such action. Therefore, except in the most egregious cases, termination of federal funding would actually stymie the purposes of FERPA, rather than advance them. *See Maynard v. Greater Hoyt Sch. Dist.*, 876 F.Supp. 1104, 1107 (D.S.D.1995) (stating that termination of funding as a sole remedy "would serve to exacerbate the community's financial burden in providing the 'free, appropriate, public education' required by other federal statutes."); *cf. Guardians Assoc. v. Civil Serv. Comm'n of New York*, 463 U.S. 582, 601, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (stating that under Ti-

---

5. The Court notes that there is one major difference between the statutory enforcement scheme under Title VI and that which is present under FERPA. The administrative regulations promulgated under Title VI specify that "any other means authorized by law" include, but are not limited to, "(1) a reference to the Department of Justice with a recommendation that appropriate proceedings be brought to enforce any rights of the United States under any law of the United States ... or any assurance or other contractual undertaking ...." 45 C.F.R. § 80.8. The Department of Education has not promulgated a similar regulation under FERPA.

Nevertheless, the fact that the agency interpreted this phrase in Title VI as authorizing civil enforcement actions and the fact that courts accepted it as a reasonable interpretation supports the conclusion that the very similar enforcement language in FERPA also authorizes such actions.

tle VI of the Civil Rights Act, which has similar enforcement language to FERPA, Congress regarded termination of funds as " 'a last resort, to be used only if all else fails,' because 'cutoffs of Federal funds would defeat important objectives of federal legislation, without commensurate gains in eliminating racial discrimination or segregation.' ") (quoting 110 Cong.Rec. 6544, 6546); *Cannon v. University of Chicago*, 441 U.S. 677, 705 n. 38, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (In a case involving the issue of whether Title IX of the Education Amendments of 1972 authorized a private right of action or whether termination of funding was the sole means of enforcement, the Court observed that "Congress itself has noted the severity of the fund-

cutoff remedy and has described it as a last resort, all else—including 'lawsuits'— failing") (citing 110 Cong.Rec. S7067 (1965)).

In sum, based on the plain language of § 1234c(a)(4) and the purposes for which FERPA was enacted, the Court finds that the Department and the United States are statutorily authorized to bring civil actions to enforce FERPA.[6]

### 2. Inherent Right to File Suit

■ Assuming arguendo that FERPA and the accompanying enforcement provisions in § 1234c do not expressly authorize the Department and the United States to file suits to enforce FERPA's require-

---

**6.** *The Chronicle* argues that two canons of statutory construction, *ejusdem generis* and *noscitur a sociis*, lead to the conclusion that Congress intended the phrase "take any other action authorized by law" to authorize only enforcement mechanisms similar to the three specific remedies that precede the phrase in § 1234c.

"Under the principle of ejusdem generis, when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration." *Norfolk & Western Ry. Co. v. American Train Dispatchers Association*, 499 U.S. 117, 129, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991). Similarly, "noscitur a sociis" provides that a word is known by the company it keeps. *See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 694, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995). The purpose of these canons is to avoid giving unintended breadth to a statutory provision that is ambiguous on its face. *See Garcia v. United States*, 469 U.S. 70, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984); *Newsom v. Friedman*, 76 F.3d 813, 820 (7th Cir.1996) (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961)).

While the Court does not ignore the logic of these canons, it nonetheless believes that they do not dictate the result here. These canons do not control "when the whole context dictates a different conclusion[,]" or when there is no uncertainty regarding the statutory language. *Norfolk & Western Ry. Co.*, 499 U.S. at 129, 111 S.Ct. 1156; *see also United States v. Veal*, 153 F.3d 1233, 1246 (11th Cir.1998), *cert. denied* 526 U.S. 1147, 119 S.Ct. 2024, 143 L.Ed.2d 1035 (1999). As stated above,

the Court finds that the literal meaning of the phrase "take any other action authorized by law" includes civil actions for declaratory and injunctive relief. Therefore, the Court need not look to the principles of ejusdem generis and noscitur a sociis for assistance in interpreting the statute. *See Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980) (holding that ejusdem generis was not applicable in interpreting § 307(b)(1) of the Clean Air Act because there was no uncertainty in the phrase "any other final action", and also stating that the expansive language of the phrase "must be construed to mean exactly what it says, namely any other final action.") *United States v. Rodriguez–Rios*, 14 F.3d 1040, 1044–45 (5th Cir. 1994) ("We are authorized to deviate from the literal language of a statute only if the plain language would lead to absurd results, or if such interpretation would defeat the intent of Congress.").

Furthermore, the words *"any other* action" indicate that Congress intended the phrase to include enforcement procedures that are different than, rather than similar to, those that are specifically enumerated. Indeed, the American Heritage Dictionary defines the word "other" to mean, inter alia: "Different from that or those implied or specified"; and "Of a different character or quality." The American Heritage Dictionary of the English Language 931 (1981).

In addition, *The Chronicle* has failed to point out to the Court any enforcement mechanisms that would be similar enough to those that are enumerated in § 1234c to satisfy the principles of ejusdem generis and noscitur a sociis.

ments, the Court still finds that they have the authority and standing to file this action. This finding is based on the United States' inherent right, regardless of express statutory authority, to sue a recipient of federal funding to enforce the terms and conditions of a federal grant. *See Henke v. United States Dept. of Commerce*, 83 F.3d 1445, 1450 (D.C.Cir.1996); *State of New York v. Federal Aviation Admin.*, 712 F.2d 806, 809 (2d Cir.1983); *United States v. Marion County Sch. Dist.*, 625 F.2d 607, 609 (5th Cir.1980), *cert. denied*, 451 U.S. 910, 101 S.Ct. 1980, 68 L.Ed.2d 298 (1981); *United States v. Baylor Univ. Med. Ctr.*, 564 F.Supp. 1495, 1498 (N.D.Tex.1983), *aff'd in part, modified in part, vacated in part*, 736 F.2d 1039 (5th Cir.1984), *cert. denied*, 469 U.S. 1189, 105 S.Ct. 958, 83 L.Ed.2d 964 (1985); *United States v. Tatum Independent Sch. Dist.*, 306 F.Supp. 285, 288 (E.D.Tex.1969); *United States v. Frazer*, 297 F.Supp. 319, 322–23 (M.D.Ala.1968).

■ Federal grants authorized by Congress create binding contracts between the United States and the recipient, and the United States has the authority to fix the terms and conditions upon which federal funds will be disbursed. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286, 118 S.Ct. 1989, 1994, 141 L.Ed.2d 277 (1998); *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 640, 119 S.Ct. 1661, 1670, 143 L.Ed.2d 839 (1999) ("When Con-

gress acts pursuant to its spending power, it generates legislation 'much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.' ") (citing *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)); *United States v. Northern Pacific Ry. Co.*, 256 U.S. 51, 63, 41 S.Ct. 439, 65 L.Ed. 825 (1921); *McGee v. Mathis*, 71 U.S. 143, 153, 4 Wall. 143, 18 L.Ed. 314 (1866); *New York v. Federal Aviation Admin.*, 712 F.2d 806, 809 (2d Cir.1983); *United States v. Marion County Sch. Dist.*, 625 F.2d 607, 609 (5th Cir.1980), *cert. denied*, 451 U.S. 910, 101 S.Ct. 1980, 68 L.Ed.2d 298 (1981); *United States v. Frazer*, 297 F.Supp. 319, 322 (M.D.Ala. 1968). *United States v. County Sch. Bd.*, 221 F.Supp. 93, 99–100 (E.D.Va.1963) (stating that it has been long held that federal grants create binding contracts between the United States and the recipient).[7] Accordingly, acceptance of a federal grant to which conditions are attached "creates an obligation to perform the conditions on the part of the recipient." *Frazer*, 297 F.Supp. at 322 (citing *United States v. Northern Pacific Ry. Co.*, 256 U.S. 51, 41 S.Ct. 439, 65 L.Ed. 825 (1921)); *see also Marion County*, 625 F.2d at 609–10.

Furthermore, when the United States places conditions on a grant of federal

7. The Court notes that any such conditions must be unambiguously stated in order to bind a recipient of federal funding. *See Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); *United States v. Parish of St. Bernard*, 756 F.2d 1116, 1121 (5th Cir.1985), *cert. denied*, 474 U.S. 1070, 106 S.Ct. 830, 88 L.Ed.2d 801 (1986). However, contrary to the argument raised by *The Chronicle*, such conditions must be clearly stated by Congress in the applicable statute, not by the *agency* in the actual funding agreement. *See Pennhurst*, 451 U.S. at 17, 101 S.Ct. 1531 ("By insisting that *Congress* speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequence of their participation.") (emphasis added). Therefore, as long as FERPA clearly states the

requirements with which a fund recipient must comply, it is of no consequence whether the grant agreement explicitly restates those requirements or merely cites to FERPA. The Court believes that FERPA places clear and unambiguous obligations and restrictions on fund recipients, and thus, a "contract" between the United States and each Defendant was created. *See Maynard v. Greater Hoyt Sch. Dist.*, 876 F.Supp. 1104, 1107 (D.S.D. 1995) (holding that FERPA establishes "mandatory and direct obligations regarding educational records on school districts that receive federal funds"); *Belanger v. Nashua, New Hampshire, Sch. Dist.*, 856 F.Supp. 40, 46 (D.N.H.1994) ("The plain meaning of the language of FERPA sets forth what educational agencies or institutions must do and not do in order to be eligible for federal funds.").

funds, it has an inherent right, separate from any statutory enforcement rights, "to sue for enforcement of the recipient's obligation in court." *Marion County,* 625 F.2d at 609; *see also Guardians Assoc. v. Civil Serv. Comm'n of New York,* 463 U.S. 582, 630–31, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (Marshall, J., dissenting) ("Indeed, in extending grants the United States has always retained an inherent right to sue for enforcement of the recipient's obligation."); *Bell v. New Jersey & Pennsylvania,* 461 U.S. 773, 794, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983) (White, J., concurring) (stating that contractual agreements between the United States and the States containing conditions of fund disbursement are, absent contrary congressional intent, "surely enforceable in a court of law"); *Henke v. United States Dept. of Commerce,* 83 F.3d 1445, 1450 (D.C.Cir.1996); *State of New York v. Federal Aviation Admin.,* 712 F.2d at 809; *United States v. Baylor Univ. Med. Ctr.,* 564 F.Supp. 1495, 1498 (N.D.Tex.1983), *aff'd in part, modified in part, vacated in part,* 736 F.2d 1039 (5th Cir.1984), *cert. denied,* 469 U.S. 1189, 105 S.Ct. 958, 83 L.Ed.2d 964 (1985);

*United States v. Tatum Indep. Sch. Dist.,* 306 F.Supp. 285, 288 (E.D.Tex.1969); *United States v. Frazer,* 297 F.Supp. at 322–23. When filing such an action, the United States may seek whatever remedy is necessary to enforce the conditions of the grant. *See Marion County,* 625 F.2d at 617; *Guardians Assoc. v. Civil Serv. Comm'n,* 463 U.S. at 630–31, 103 S.Ct. 3221 (Marshall, J., dissenting); *Rex Trailer Co. v. United States,* 350 U.S. 148, 151, 76 S.Ct. 219, 100 L.Ed. 149 (1956).[8]

In this case, both Ohio State and Miami entered into "Program Participation Agreements" with the Department of Education. (Doc. 29 and Ex. 1 and 2 attached thereto).[9] These agreements provide for the disbursement of federal funds to OSU and Miami pursuant to various federal statutory programs. (Id.) Additionally, each agreement states that "participation is subject to the terms and conditions set forth in this agreement." (Id.) One such condition, set forth in § 3.c. of the agreement, provides that "[t]he Institution agrees to comply with ... [t]he Family Rights and Privacy Act of 1974 and the

---

**8.** In response to the United States' claim that it has inherent authority to sue to enforce the terms of the grant agreement in this case, *The Chronicle* makes a rather disingenuous attempt to distinguish the case law relied upon by the United States and cited by the Court above. In particular, *The Chronicle* argues that the United States Court of Appeals for the Fifth Circuit, in *United States v. Parish of St. Bernard,* 756 F.2d 1116, 1121–23 (5th Cir. 1985), *cert. denied,* 474 U.S. 1070, 106 S.Ct. 830, 88 L.Ed.2d 801 (1986), has limited its holding in *Marion County.* However, *Parish of St. Bernard* differs substantially from *Marion County* and does not appear to limit the proposition that a recipient of funds under a grant agreement is obligated to perform the conditions of the agreement, and that "the United States has an inherent right to sue for enforcement of the recipient's obligation in court." *Marion County,* 625 F.2d at 609.

In *Parish of St. Bernard,* 756 F.2d at 1121, the court found that there was no express contract between the federal government and the fund recipients setting forth conditions for the disbursement of funds under the National Flood Insurance Program. Hence, the United

States did not have any basis for filing a suit in federal court to enforce the terms of the program. In *Marion County,* on the other hand, the court found a contract between the United States and the fund recipient, and held that the United States had standing to sue to enforce the conditions of that contract, namely compliance with Title VI. This factual distinction between the two cases indicates that *Parish of St. Bernard* does not limit the persuasive value of *Marion County* for purposes of the instant case.

**9.** *The Chronicle* argues that these Program Participation Agreements lack the requisite guarantee of authenticity to be proper subject's for this Court's consideration. This argument is without merit. These documents are self-authenticating under Rule 902(1) of the Federal Rules of Evidence. First, the Seal of the United States Department of Education appears on the first page of both agreements. (Doc. 29 and Ex. 1 and 2 attached thereto). Second, both agreements were signed by an agent for the Secretary of the Department of Education, which is an agency of the United States (Id.); *see also* Fed.R.Evid. 902(1).

implementing regulations, 34 CFR Part 99[.]" (Id.)

One of the requirements of FERPA is that educational institutions not adopt a policy or practice of permitting the release of education records or personally identifiable information contained therein, except as permitted under the statute. *See* 20 U.S.C. § 1232g(b)(2). Accordingly, if the Department and the United States believe that OSU and Miami are violating the terms of their agreements or are about to violate such terms, they have the right, under federal common law, to bring a civil action in federal court to resolve the dispute. Furthermore, this authority stands apart from the statute and its administrative regulations.[10]

### 3. FERPA Imposes Enforceable Obligations

■ As an additional argument against standing, *The Chronicle* argues that FERPA does not *prohibit* schools and institutions from releasing "education records," but rather, it merely authorizes the Department of Education to withdraw funding from any school or institution that chooses to release such records.[11] Therefore, it argues, the United States does not have the authority to seek declaratory and injunctive relief, such as it seeks in this case. *The Chronicle* cites several federal and state cases as support for its position. *See, e.g., Tombrello v. U.S.X. Corp.*, 763 F.Supp. 541, 545 (N.D.Ala.1991); *Girardi-*

10. *The Chronicle* argues that even if federal common law authorizes government suits to enforce the contractual conditions of federal grants, the United States, in this action, has failed to state a cause of action for breach of contract in its complaint, and thus, it cannot rely upon any contracts between Defendants and the Department as a basis for standing to file suit.

This argument is not well-taken. The Court finds that the United States pleaded sufficient facts in its Complaint to allow it to rely on a contract theory for purposes of asserting standing. In the Complaint, the United States asserts that Defendants are recipients of federal funding, and thus, subject to the provisions of FERPA. (Compl.¶¶ 1, 7, 13). The actual agreements signed between the Department and Defendants do nothing more than formalize, in writing, the universities' duty to comply with FERPA.

In other words, federal law itself creates the basis for the contract and supplies the specific conditions of the contract. *See, e.g., Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) (stating that "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions."). By suing to enforce FERPA, the United States is, in effect, suing to enforce its contracts with Defendants. Therefore, the cause of action stated in the complaint is broad enough to encompass a contract theory, and the Department can rely on its agreements with OSU and Miami to assert standing in this matter. *See generally* Fed.R.Civ.P. 8(a)(2) (stating that a pleading need contain only "a short and plain

statement of the claim showing that the pleader is entitled to relief"); *Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits."); *Bartholet v. Reishauer*, 953 F.2d 1073, 1078 (7th Cir.1992) (stating that under Rule 8(a), "the complaint need not identify a legal theory, and specifying an incorrect theory is not fatal"); *Rohler v. TRW, Inc.*, 576 F.2d 1260, 1264 (7th Cir.1978) ("[U]nder Rule 8(a)(2) it is not necessary that the plaintiff set forth the legal theory on which he relies if he sets forth sufficient factual allegations to state a claim showing that he is entitled to any relief which the court may grant."); *Morgan v. Eichler*, No. 98 C 789, 1999 WL 756064, at *3 (N.D.Ill. Sept. 9, 1999) (stating that "[a]lthough it is common to draft complaints with multiple counts, each of which specifies a single statute or legal rule, nothing in the Rules of Civil Procedure requires this[,]" and "[c]omplaints should be short and simple, giving the adversary notice while leaving the rest to further documents").

11. *The Chronicle* refers to the following language from FERPA as support for its argument: *"No funds shall be made available* under any applicable program to any educational agency or institution which has a policy or practice" of releasing or permitting the release of "education records" or any personally identifiable information contained therein. 20 U.S.C. § 1232g(b)(1) and (2) (emphasis added).

*er v. Webster College*, 563 F.2d 1267, 1267–77 (8th Cir.1977); *Bauer v. Kincaid*, 759 F.Supp. 575, 590 (W.D.Mo.1991); *Student Press Law Ctr. v. Alexander*, 778 F.Supp. 1227, 1232 n. 13 (D.D.C.1991) *Smith v. Duquesne Univ.*, 612 F.Supp. 72, 80 (W.D.Pa.1985); *Price v. Young*, 580 F.Supp. 1, 2 (E.D.Ark.1983); *Student Bar Assoc. v. Byrd*, 293 N.C. 594, 239 S.E.2d 415 (1977); *Princeton City Sch. Dist. Bd. of Educ. v. Ohio State Bd. of Educ.*, 96 Ohio App.3d 558, 566, 645 N.E.2d 773 (Ohio App.1994).

The Court, however, disagrees. Two factors support the conclusion that FERPA imposes a direct obligation on universities not to disclose "education records." First, many of FERPA's enforcement provisions would be unnecessary if the statute did not *prohibit* certain behavior. As discussed above, FERPA and § 1234c authorize the Secretary of Education, inter alia, to issue cease and desist orders and to take any other action authorized by law. *See* 20 U.S.C. §§ 1232g(f), 1234c; 34 C.F.R. § 99.67. The fact that Congress provided these types of remedies under FERPA illustrates its intention to place restrictions and obligations on schools and institutions covered by the statute. If FERPA did not *prohibit* the release of "education records" in certain circumstances, the statutory language authorizing the Secretary to issue cease and desist orders and to take any other action authorized by law would be superfluous, because there would not be any behavior from which schools would be required to cease and desist. Congress could not have intended the statute to be read in this manner. It is a well-settled principle of statutory construction that a court should avoid interpreting a statute so as to make portions of it superfluous. *See e.g., United States v. Page*, 131 F.3d 1173, 1180 (6th Cir.1997) ("It is well settled law that statutory constructions that render portions of a statute superfluous are to be avoided."), *cert. denied*, 525 U.S. 828, 119 S.Ct. 77, 142 L.Ed.2d 61 (1998); *Schering–Plough*

*Healthcare Prods., Inc., v. NBD Bank*, 98 F.3d 904, 909 (6th Cir.1996) (same).

Second, several federal courts, in the context of § 1983 actions, have held that FERPA creates federal rights and imposes mandatory obligations and restrictions on educational institutions. *See Achman v. Chisago Lakes Indep. Sch. Dist.*, 45 F.Supp.2d 664, 674 (D.Minn.1999) (holding that FERPA "creates a federal right that is enforceable through section 1983 actions"); *Cullens v. Bemis*, 979 F.2d 850, 1992 WL 337688, at *1 (6th Cir. Nov. 18, 1992) (noting that FERPA creates interests that may be vindicated in a § 1983 action); *Tarka v. Cunningham*, 917 F.2d 890, 891 (5th Cir.1990) (holding that "an action under 42 U.S.C. § 1983 may nevertheless be premised on an alleged violation of FERPA *rights*") (emphasis added); *Fay v. South Colonie Central Sch. Dist.*, 802 F.2d 21, 33 (2d Cir.1986) (stating that FERPA creates a federal interest); *Maynard v. Greater Hoyt Sch. Dist.*, 876 F.Supp. 1104, 1107 (D.S.D.1995) ("FERPA does establish mandatory and direct obligations regarding educational records on school districts that receive federal funds"); *Belanger v. Nashua, New Hampshire, School Dist.*, 856 F.Supp. 40, 46 (D.N.H.1994) ("The language of FERPA reveals a congressional intent to impose obligations directly on educational agencies or institutions."); *Krebs v. Rutgers*, 797 F.Supp. 1246, 1256 (D.N.J.1992) (stating that FERPA creates civil rights enforceable under § 1983); *Francois v. University of District of Columbia*, 788 F.Supp. 31, 32 (D.D.C.1992) (noting that FERPA "creates a federal right"). It would be anomalous on the one hand to accept the principle that FERPA creates affirmative obligations and rights that may be enforced through an action under § 1983, and on the other hand to hold today that FERPA does not create such obligations and rights within the context of an enforcement action by the government. Accordingly, the Court concludes that FERPA does restrict or prohibit certain

conduct, thus creating enforceable rights and obligations.

## C. Conclusion

Based on the above, *The Chronicle*'s Motion to Dismiss for Lack of Standing is **DENIED.**[12]

## IV. Summary Judgment

Next, the Court must address Plaintiff's motion for summary judgment. Plaintiff argues that it is entitled to summary judgment on its claim that Defendants released education records in violation of FERPA, and requests the Court to issue a permanent injunction against future violations. The material facts surrounding this matter are not in dispute.[13] Only legal issues remain to be resolved. Therefore, summary judgment is the appropriate mechanism for deciding this case.[14]

## A. Summary Judgment Standard

The procedure for granting summary judgment is found in Fed.R.Civ.P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party.

---

**12.** It should be noted that *The Chronicle,* as an alternative argument, asserts that the Department has not suffered an "injury in fact" sufficient to meet the first element of standing set forth in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). It argues that the persons affected by the indiscriminate release of "education records" are the students or parents of students mentioned in the records being disclosed, not the Department of Education.

While it is true that the students whose names appear in the disciplinary records that are released are injured by such action, the Department and the United States also suffer an injury in fact. The Department and the United States have a direct interest in ensuring that the institutions that receive federal funds under FERPA comply with the contractual and statutory provisions that were made conditions of the disbursement of such funds. This interest is sufficient to satisfy the standard articulated in *Lujan.*

In addition, the fact that this lawsuit may benefit students and their parents does not mean that the United States lacks standing. [T]he mere fact that a suit by the United States operates to confer a benefit on private citizens does not, in and of itself, place the action outside the scope of the jurisdictional statute. The government's interest need not be pecuniary or proprietary; it may decide to litigate simply in order to assure the proper implementation of one of the government's policies and programs, to prevent the violation of constitutional rights, or to protect its sovereign interest. 14 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3651 (2d. ed.1985) (citations omitted).

**13.** *The Chronicle* argues, in its Motion Requesting an Order of Procedure (Doc. 22), that there may be genuine issues of material fact, and thus, additional discovery is necessary before this matter is ripe for judgment. However, *The Chronicle* has done nothing more than make a general assertion that more discovery could lead to facts that may affect the outcome of the case. Moreover, Plaintiff and both original defendants agree that there are no material facts in dispute here, and that this matter is ripe for judgment. (Docs. 25 and 26). Therefore, the Court finds that all material facts necessary to bring the legal issues before the Court are present and undisputed. Additional discovery is not necessary.

**14.** The fact that Plaintiff seeks, inter alia, equitable relief in the form of a permanent injunction does not restrict the use of summary judgment as a procedural mechanism in this case. *See Continental Airlines, Inc. v. Intra Brokers, Inc.,* 24 F.3d 1099, 1102 (9th Cir.1994) ("There is nothing novel about a permanent injunction issued on summary judgment rather than after trial. Such a procedure comports with Federal Rule of Civil Procedure 56."); *United States v. McGee,* 714 F.2d 607, 613 (6th Cir.1983) (holding that an evidentiary hearing is not necessary before an injunction may be granted where no triable issues of fact are involved); *see also* 10A Charles A. Wright, Arthur R. Miller, Edward H. Cooper, Federal Practice and Procedure § 2731, at 97 (3d ed. 1998) ("[I]f there are no triable fact issues and the court believes equitable relief is warranted, it is fully empowered to grant it on a Rule 56 motion."). As stated above, no disputed factual issues are present in this case, and thus, an evidentiary hearing on the merits is not necessary.

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's ·case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir.1989). The court in *Street* identified a number of important principles applicable in summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479. In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby*, 477 U.S. at 257, 106 S.Ct. 2505). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary· judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish·that it is bereft of a genuine issue of material fact." *Id.* That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

**B. Permanent Injunction Standard**

Plaintiff seeks to permanently enjoin Defendants from releasing student disciplinary records to third parties, such as *The Chronicle*, unless otherwise permitted under FERPA. The standard for granting a permanent injunction is essentially the same as the standard for a preliminary injunction. In determining whether to issue a preliminary injunction, a court must consider:

> (1) whether the moving party has a substantial probability of ·success on the merits; (2) whether irreparable injury will occur if the injunction is not issued; (3) whether the injunction will have a harmful effect on third parties; and (4) whether the public interest would be served by the injunction.

*CSX Transp., Inc. v. Tennessee State Bd. of Equalization*, 964 F.2d 548, 550–51 (6th Cir.1992). "In addition, an injunction generally should not issue if there is an adequate remedy at law." *Id.* at 551. The standard applicable to permanent injunctions differs in that the plaintiff must show actual success on the merits rather than a mere likelihood of success. *See Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

**1. Success on the Merits**

The issue before the Court is straightforward: Are student disciplinary records "education records" as defined by FERPA, and thus, protected from public disclosure absent statutory exception? Therefore, this case involves the interpretation of a federal statute. As such, the Ohio Supreme Court's decision in *State ex.*

*rel. The Miami Student v. Miami University*, 79 Ohio St.3d 168, 680 N.E.2d 956 (1997), does not dictate the Court's decision on this matter. It is axiomatic that a federal court's interpretation of federal law takes precedent over that of a state court. *See Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516, 520 (6th Cir.1997).[15]

Likewise, *The Chronicle*'s argument that Ohio public policy favors openness and disclosure of disciplinary records has no bearing on the Court's interpretation of FERPA. The United States Congress, when it enacted FERPA, presumably weighed the various policy interests involved. Therefore, while *The Chronicle* has provided the Court with several policy interests that weigh against keeping disciplinary records private, those arguments are directed to the wrong branch of government. The Court's duty is to discern Congress' intent regarding FERPA by applying sound principles of statutory interpretation. It would be a gross violation of the constitutional principle of separation of powers for the Court to act as a super-legislature and decide what it thinks the law should be based on contemporary public policy interests.

### a. Plain Language

Accordingly, confining its role to interpreting FERPA's meaning, the Court finds that university disciplinary records fall within the definition of "education records" as stated in 20 U.S.C. § 1232g.

Therefore, absent an applicable exception, FERPA precludes the disclosure of student disciplinary records or personally identifiable information contained therein to third-parties without the consent of the student or his or her parents.

FERPA states in pertinent part:

No funds shall be made available under any applicable program to any educational ... institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein ...) of students without the written consent of their parents to any individual, agency, or organization....

20 U.S.C. 1232g(b)(1). The Act additionally provides that "[n]o funds shall be made available under any applicable program to any educational ... institution which has a policy or practice of releasing, or providing access to, any personally identifiable information in education records," except as expressly permitted under the Act. 20 U.S.C. § 1232g(b)(2). Pursuant to these provisions, the Department of Education has promulgated regulations requiring that a parent or eligible student "shall provide a signed and dated written consent before an educational ... institution [may] disclose personally identifiable information from the student's education records," except as otherwise allowed under the Act. 34 C.F.R. § 99.30(a).[16]

The issue before the Court is the scope of the term "education records," and

---

**15.** Moreover, there is no conflict between Ohio law and federal law that would affect the outcome of this case, and thus, *The Chronicle*'s preemption arguments are misplaced. The Supremacy Clause is not implicated in the instant case. The Court is merely interpreting a federal law as it relates to the case or controversy before it. This Court's decision in no way limits or otherwise affects Ohio's Public Records Act, because that Act does not require disclosure of "[r]ecords the release of which is prohibited by ... federal law." Ohio Rev.Code § 149.43(A)(1)(q).

**16.** The Department has defined "personally identifiable information" as follows:

"Personally identifiable information" includes, but is not limited to:
(a) The student's name;
(b) The name of the student's parent or other family member;
(c) The address of the student or student's family;
(d) A personal identifier, such as the student's social security number or student number;
(e) A list of personal characteristics that would make the student's identity easily traceable; or
(f) Other information that would make the student's identity easily traceable.
34 C.F.R. § 99.3.

whether it includes student disciplinary records. FERPA broadly defines "education records" as follows:

[T]hose records, files, documents, and other materials which—

(i) contain information directly related to a student; and

(ii) are maintained by an educational agency or institution or by a person acting for such agency or institution.

20 U.S.C. § 1232g(a)(4). As the Court stated in its Order granting a preliminary injunction in this case: "It is abundantly clear that the disciplinary records that are the subject of the instant case satisfy both prongs of the statutory definition of education records." (Doc. 6). First, the disciplinary records at issue in this case clearly "contain information directly related to a student." The offenders being disciplined, and often the victims of the offense, are students of the respective universities, and the matters addressed in the disciplinary records pertain to actions committed or allegedly committed by or against those students. Second, these records are "maintained" by Defendants Ohio State University and Miami University. Accordingly, the plain language of the statute indicates that Defendants' student disciplinary records are covered by the privacy protections of FERPA. *See Belanger v. Nashua, New Hampshire, School Dist.*, 856 F.Supp. 40, 48 (D.N.H.1994) ("The plain meaning of [FERPA's] statutory language reveals that Congress intended for the definition to be broad in its scope."); *DTH Publishing Corp. v. University of North Carolina*, 128 N.C.App. 534, 496 S.E.2d 8, 13 (1998) (noting the breadth of FERPA's definition of "education records").[17]

### b. Legislative History

 A court must adhere to the plain language of a statute, unless a contrary congressional intent is clearly established in the legislative history. *See, e.g., Ardestani v. I.N.S.*, 502 U.S. 129, 135, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991) ("The 'strong presumption' that the plain language of the statute expresses congressional intent is rebutted only in 'rare and exceptional circumstances,' when a contrary legislative intent is clearly expressed.") (quoting

---

**17.** In making its argument that student disciplinary records are not "education records," *The Chronicle* relies, in part, on several state and lower federal court opinions that have interpreted FERPA's definition of "education records" to exclude disciplinary records and other similar types of student records. *See, e.g., Bauer v. Kincaid*, 759 F.Supp. 575 (W.D.Mo.1991); *Kirwan v. Diamondback*, 352 Md. 74, 721 A.2d 196 (1998); *State ex. rel. The Miami Student v. Miami University*, 79 Ohio St.3d 168, 680 N.E.2d 956 (1997); *Red & Black Publishing v. Board of Regents*, 262 Ga. 848, 427 S.E.2d 257 (1993). These cases all rely, at least in part, on the premise that school records are not "education records" for purposes of FERPA unless they contain academic or other educationally-related information. *See Bauer*, 759 F.Supp. at 591 *Kirwan*, 721 A.2d at 204; *Miami University*, 680 N.E.2d at 959; *Red & Black Publishing*, 427 S.E.2d at 261. With all due respect to these courts, this Court refuses to adopt such a narrow interpretation of FERPA's definition of "education records." None of the above-cited decisions provided any reasoning for their narrow interpretation of FERPA, and this Court fails to see how such a limited meaning of "education records" can be discerned from the plain language.

If Congress had left the term "education records" undefined, it is plausible that one might interpret its ordinary meaning to refer only to academic or other educationally-related information. However, Congress provided a very clear and broad definition of "education records" in the statute. Therefore, it is the plain language of Congress' definition that the Court must interpret, not the term itself. *See Arnold v. United Parcel Service*, 136 F.3d 854, 859 (1st Cir.1998) (stating that the court interprets a statutory term according to is ordinary or natural meaning only when Congress has failed to expressly define that term); *In re Telxon Corp. Securities Litigation*, 67 F.Supp.2d 803, 811 (N.D.Ohio 1999) ("In determining the meaning of a term or word used in a statute, the Court must begin with the 'usual [plain] and ordinary meaning' of that term or word, unless a special meaning is provided in the statute itself."). Proceeding from this legal perspective, it becomes clear that university records do not have to be related to academic matters to be "education records" under FERPA.

*Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981)); *Parker–Hannifin v. C.I.R.,* 139 F.3d 1090, 1095 (6th Cir.1998) ("We begin with the language of the statute itself, and interpret it according to its plain language absent evidence of a contrary legislative intent[.]") (citations omitted); *Bradley v. Austin,* 841 F.2d 1288, 1293 (6th Cir.1988) (stating that if the court finds statutory text unambiguous, the text is conclusive unless there is a clearly expressed legislative intent to the contrary). The Court is unable to find any contrary congressional intent regarding the scope of the definition of "education records" in FERPA's rather sparse legislative history.

The purpose of the Act is "to assure parents of students ... access to their education records *and to protect such individuals' rights to privacy by limiting the transferability of their records without their consent." Joint Statement,* 120 Cong.Rec. 39858, 39862 (Dec. 13, 1974) (emphasis added). Interpreting the term "education records" so as to not include student disciplinary records would permit public disclosure of such records and would lessen students privacy rights under FERPA. This would undermine one of the stated purposes of FERPA, as it would allow universities to release students' disciplinary records without consent.

Additionally, the legislative history contains no statements suggesting that Congress intended to exclude student disciplinary records from its definition of "education records," or that "education records" should be limited to records containing academic information. Thus, there is nothing to contradict the plain meaning of FERPA's text.[18]

Other principles of statutory construction also suggest that the term "education records" should be interpreted to include student disciplinary records. "Under the principle of statutory construction expressio unius est exclusio alterius, the enumeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded." *See United States v. Rocha,* 916 F.2d 219, 243 (5th Cir.1990) (citations omitted), *cert. denied,* 500 U.S. 934, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991); *see also Sunshine Development, Inc. v. FDIC,* 33 F.3d 106, 116 (1st Cir.1994).

Applying the principle of expresio unius to the instant case supports the conclusion that student disciplinary records are included within the definition of "education records." FERPA contains several provisions that exempt certain records from the definition of "education records." Section 1232g(4)(B) states, in general, that the

---

18. Amici in Opposition to Plaintiff cite various statements by Senator James Buckley, FERPA's sponsor, regarding the scope of FERPA and the purposes that it was enacted to serve. Amici argue that these statements indicate Congress' intent to exclude disciplinary records from the coverage of FERPA. *See* 120 Cong.Rec. 36532 (Dec. 1, 1974) (Speech to Legislative Conference of the National Congress of Parents and Teachers); 121 Cong. Rec. 13990 (Nov. 19, 1974) (Questions About and Objections to the Buckley Amendment). Specifically, Amici state in their brief that "[i]n neither of these speeches ... did Senator Buckley mention any concern with the confidentiality of campus law enforcement or student disciplinary records." (Doc. 18, p. 21).

The fact that Senator Buckley did not specifically mention student disciplinary records as a type of record which FERPA intends to protect is of no consequence to the Court's analysis. At best, Senator Buckley's statements are ambiguous comments regarding some of the information that FERPA is intended to protect. These statements do not clearly and affirmatively indicate an intent to exclude disciplinary records from the definition of "education records," which would be necessary for the Court to disregard the otherwise plain language of the statue. As stated above, without a clear expression in the legislative history of congressional intent to exclude disciplinary records from FERPA, the Court is guided by the text of the statue. *See United States v. Knox,* 32 F.3d 733, 744 (3d Cir.1994) ("Only the most extraordinary showing of contrary congressional intent may justify altering the plain meaning of a statutory term."), *cert. denied,* 513 U.S. 1109, 115 S.Ct. 897, 130 L.Ed.2d 782 (1995).

term "education records" does not include (i) records of teachers or school administrators that are in the sole possession of the maker and are not accessible to anyone else except a substitute; (ii) certain law enforcement records; (iii) employment records maintained in the normal course of business; and (iv) records of medical or psychological treatment regarding students eighteen years of age or older. *See* 20 U.S.C. § 1232g(4)(B)(i)–(iv).

The fact that Congress included several detailed exceptions to its definition of "education records" indicates that it knew precisely what types of records it wanted included within the definition, and conversely, what types it wanted to exclude. Therefore, by failing to expressly except student disciplinary records from the definition of "education records," Congress must have intended such records to be included within the otherwise broad definition.

Congress' subsequent legislative actions regarding FERPA also suggest that it intended student disciplinary records to be covered by the statute. Congress has amended FERPA on several occasions to permit the release of disciplinary records in certain circumstances. For example, § 1232g(b)(6)(A) permits schools to disclose the results of any disciplinary proceeding to the victim of the crime that was the subject of the proceeding if it was a crime of violence or a nonforcible sex offense. Additionally, in October 1998, Congress expanded on this exception to allow educational institutions to release to the public at large the final results of any disciplinary proceeding conducted against a student who has committed a crime of violence or a nonforcible sex offense, if the institution finds that the criminal act constituted a violation of the institution's rules or policies. *See* § 1232g(b)(6)(B). Congress has also enacted a provision requir-

ing the disclosure of disciplinary records to both students accused of sexual assault and the alleged victims of the sexual assault. *See* 20 U.S.C. § 1092(f)(8)(B)(iii).

The fact that Congress has enacted various narrow provisions permitting the disclosure of student disciplinary records in limited circumstances shows that Congress obviously is concerned with protecting the privacy of disciplinary records. More importantly, it indicates that Congress must have intended FERPA to prohibit the release of student disciplinary records; otherwise it would be unnecessary for Congress to enact statutory exceptions permitting their limited disclosure. Stated otherwise, to hold that Defendants' disciplinary records are not covered by FERPA would render the above-mentioned exceptions redundant and superfluous, a result the Court should attempt to avoid. *See, e.g., Hohn v. United States,* 524 U.S. 236, 249, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998) (stating that the Court is reluctant to adopt a construction making another statutory provision superfluous).

### c. Agency Interpretation of "Education Records"

■ The Department of Education's interpretation of FERPA, which is entitled to deference, also supports the conclusion that student disciplinary records are "education records" within the meaning of FERPA.[19] The United States Supreme Court, in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), set forth the analytical framework regarding statutory interpretation where federal agencies are involved. The Court stated that if the intent of Congress is clear from the plain language of the statute, the court, as well as the agency involved, must give effect to such unambiguously ex-

---

**19.** The Court notes that this case does not command reference to agency interpretations of FERPA because the intent of Congress is clearly stated in the text of the statute. There-

fore, the Court provides this analysis merely as additional support for its conclusion that student disciplinary records are "education records" as defined in FERPA.

pressed intent. *See id.* at 842–43, 104 S.Ct. 2778. If, however, the court determines that a provision in the statute is ambiguous and the intent of Congress is unclear, the court must defer to an agency's reasonable interpretation of the provision. *See id.* at 843–45, 104 S.Ct. 2778; *see also Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) ("The administrative interpretation of the Act by the enforcing agency is entitled to great deference."); *Arrow Elec. Co. v. NLRB,* 155 F.3d 762, 765 n. 1 (6th Cir.1998); *Bartling v. Fruehauf Corp.,* 29 F.3d 1062, 1072 (6th Cir.1994); *Hamama v. INS,* 78 F.3d 233, 239 (6th Cir.1996) (stating that the court is to "defer to an agency's reasonable interpretation of a statute it administers unless 'the intent of Congress is clear.' ") (citing *Chevron,* 467 U.S. at 843–44, 104 S.Ct. 2778).

The Department of Education, which is the agency responsible for administering and enforcing FERPA, stated during regulatory proceedings that it interprets "education records," as defined in FERPA, to include student disciplinary records:

> The Secretary remains legally constrained to conclude that records of an institution's disciplinary action or proceeding are "education records" under FERPA, not law enforcement unit records, and that excluding these records from the definition of "education records" can be accomplished only through a statutory amendment of FERPA by Congress.
>
> . . . . .
>
> The Secretary has carefully analyzed the statutory and regulatory authority to address these concerns. Based on the broad definition of "education records," which includes those records, files, documents, and other materials that contain

information directly related to a student, except those that are specifically excluded by statute, all disciplinary records, including those related to non-academic or criminal misconduct by students, are "education records" subject to FERPA.... Although the Secretary is equally concerned with the problem of crime on campus, it is clear that only Congress has the authority to change the statutory provisions of FERPA to permit disclosure of disciplinary records without prior consent.

Rules and Regulations, Department of Education, 60 F.R. 3464, 3465 (Jan. 17, 1995). Assuming arguendo that the Court found FERPA's plain language and its legislative history ambiguous, it would defer to the Department's interpretation because it is a reasonable one. Thus, the result remains unchanged—student disciplinary records are protected from disclosure under FERPA, unless otherwise permitted by a statutory exception.[20]

### d. Statutory Exceptions to FERPA

■ Having concluded that FERPA's definition of "education records" includes Defendants' student disciplinary records, the Court must determine whether any of FERPA's exceptions apply. *The Chronicle* argues that Defendants' student disciplinary records are not protected by FERPA because they are actually law enforcement records, which Congress has expressly excluded from FERPA's coverage.

FERPA states that "[t]he term 'education records' does not include ... records maintained by a law enforcement unit of the educational agency or institution that were created by that law enforcement unit for the purpose of law enforcement[.]" 20 U.S.C. § 1232g(a)(4)(B)(ii). A "[l]aw enforcement unit means any ... compo-

---

**20.** *The Chronicle* argues that even if student disciplinary records are "education records" under FERPA, Defendants may still release those records because FERPA's language does not prohibit the release of education records, but rather, it merely authorizes the withholding of funds from schools who do not comply with FERPA. The Court rejected this same argument when raised as an argument against jurisdiction; the Court's reasoning applies with equal force here.

nent of an educational agency or institution ... that is officially authorized or designated by that agency or institution to (i)[e]nforce any local, State, or Federal law ... or (ii)[m]aintain the physical security and safety of the agency or institution." 34 C.F.R. § 99.8(a)(1)(i)–(ii). "A component of an educational agency or institution does not lose its status as a law enforcement unit if it also performs other, non-law enforcement functions ... including investigation of incidents or conduct that constitutes or leads to a disciplinary action or proceedings against the student." 34 C.F.R. § 99.8(a)(2).

The Court believes that FERPA's "law enforcement records" exception is capable of more than one interpretation. One could construe the language to include disciplinary records of the type at issue in this case. Due to the fact that the scope of FERPA's "law enforcement records" exception is ambiguous, the Court defers to the Department's detailed definitions regarding this exception, which the Court finds are reasonable interpretations of the

statute. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[21]

The Department clearly has distinguished "law enforcement records" from "disciplinary records." In its regulations, the Department states that: "Records of a law enforcement unit does not mean ... [r]ecords created and maintained by a law enforcement unit exclusively for a non-law enforcement purpose, such as a disciplinary action or proceeding conducted by the educational agency or institution." 34 C.F.R. § 99.8(b)(2)(ii). Furthermore, the Department defines "disciplinary action or proceeding" as "the investigation, adjudication, or imposition of sanctions by an educational agency or institution with respect to an infraction or violation of the internal rules of conduct applicable to students of the agency or institution." 34 C.F.R. § 99.3.[22]

Based on the Department's regulations and other statements, the records at issue

21. *The Chronicle* also apparently accepts the Department's interpretations and clarifications of FERPA's provisions, as it uses the Department's regulations in its argument. (Doc. 19, pp. 7–10).

22. The Secretary of Education further elaborated on the distinction between "law enforcement records," and "disciplinary records," as follows:

The proposed regulations defined for the first time both "law enforcement unit" and "disciplinary action or proceeding." In contrast to law enforcement unit records, the Department has been legally constrained to treat the records of a disciplinary action or proceeding as "education records" under FERPA (20 U.S.C. § 1232g), that is, protected against non-consensual disclosure except in statutorily specified circumstances.... The Secretary proposed the definition of "disciplinary action or proceeding" to help institutions distinguish disciplinary records from law enforcement unit records, which are excluded by statute

from the definition of "education records" in the circumstances specified.

. . . . .

FERPA was amended by Congress to exempt from the definition of "education records" those records that are created by a law enforcement unit for a law enforcement purpose and maintained by that law enforcement unit, thus allowing education agencies and institutions to disclose these records publicly without obtaining prior written consent. If a law enforcement unit of an institution creates a record for law enforcement purposes and provides a copy of that record to a dean, principal, or other school official for use in a disciplinary proceeding, that copy is an "education record" subject to FERPA if it is maintained by the dean, principal, or other school official and not the law enforcement unit. The original document created and maintained by the law enforcement unit is not an "education record" and does not become an "education record" merely because it was shared with another component of the institution.

Rules and Regulations, Department of Education, 60 F.R. 3464–3466 (Jan. 17, 1995).

in this case clearly are "[r]ecords created and maintained ... exclusively for a non-law enforcement purpose, such as a disciplinary action or proceeding conducted by the education agency or institution." 34 C.F.R. § 99.8(b)(2)(ii). Accordingly Defendants' disciplinary records are not "records of a law enforcement unit," and thus, they do not fall within FERPA's exception for law enforcement records.

#### e. First Amendment Right of Access

■ Alternatively, *The Chronicle* argues that to the extent that FERPA is interpreted to prohibit public disclosure of student disciplinary records, it violates the First Amendment of the United States Constitution. Specifically, *The Chronicle* asserts that the public has a First Amendment right of access to government records and other information within its control, and FERPA limits this right. Further, it maintains that the government can overcome this right only by showing that FERPA serves an important government interest that outweighs the public's First Amendment right. It is unnecessary, however, for the Court to inquire into the government's interests in prohibiting the release of university disciplinary records, because the First Amendment does not confer a public right of access to university disciplinary records, such as those at issue in this case.

■ The First Amendment prohibits Congress from making any law "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. It is well settled that the right to receive information "is an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution...." *Board of Educ. v. Pico*, 457 U.S. 853, 866–67, 102 S.Ct. 2799, 73

L.Ed.2d 435 (1982). However, this principle assumes the presence of a willing speaker and a willing listener; the right to receive information cannot be stretched to the point of creating a First Amendment right allowing the public to *compel* disclosure of all government-held information. In other words, there is no affirmative constitutional duty requiring the government to disclose non-public information within its possession.

In *Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) (Burger, C.J., plurality opinion), the Court had to determine whether respondent broadcasting company, as a member of the public, had a First and Fourteenth Amendment right of access to a county jail. *See id.* at 3–6, 98 S.Ct. 2588.[23] While Justice Burger's plurality opinion acknowledged that "conditions in jails and prisons are clearly matters 'of great public importance[,]'" *id.* at 8, 98 S.Ct. 2588 (quoting *Pell v. Procunier*, 417 U.S. 817, 830 n. 7, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)), it held that "[n]either the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control." *See id.* at 15, 98 S.Ct. 2588. Moreover, the Court noted that "[t]his Court has never intimated a First Amendment guarantee of a right of access to all sources of information within government control." *Id.* at 9, 98 S.Ct. 2588. The Court also stated that "[t]here is an undoubted right to gather news 'from any source by means within the law,' but that affords no basis for the claim that the First Amendment compels others—private persons or governments—to supply information." *Id.* at 11, 98 S.Ct. 2588 (citations omitted). Justice Stewart, in his concurring opinion, agreed that "[t]he First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by the govern-

---

**23.** In *Houchins,* Justices Marshall and Blackmun took no part in the consideration or decision of the case. Moreover, the case resulted in a plurality opinion; Justice Burger, joined by Justices White and Rehnquist, announced the judgment of the Court, and Justice Stewart wrote a separate opinion concurring in the judgment.

ment," but rather "[t]he Constitution does no more than assure the public and the press equal access once government has opened its doors." *Id.* at 16, 98 S.Ct. 2588 (Stewart, J., concurring).

Several lower federal courts have also held in a variety of contexts that the First Amendment does not compel the government to provide public access to information within its control. *See United States v. Gonzales,* 150 F.3d 1246, 1254 (10th Cir.1998) (holding that no First Amendment right of access applies to judicial administrative documents), *cert. denied,* 525 U.S. 1129, 119 S.Ct. 918, 142 L.Ed.2d 915 (1999); *Lanphere & Urbaniak v. Colorado,* 21 F.3d 1508, 1511 (10th Cir.1994) (holding that law prohibiting access to criminal justice records from those intending to use the records for commercial purposes did not violate First Amendment on *access* grounds, because "there is no constitutional right, and specifically no First Amendment right of access to government records"), *cert. denied,* 513 U.S. 1044, 115 S.Ct. 638, 130 L.Ed.2d 544 (1994); *El Dia, Inc. v. Hernandez Colon,* 963 F.2d 488, 494–95 (1st Cir.1992) (stating that the Supreme Court has never recognized a constitutional right of access to executive branch documents); *Calder v. IRS,* 890 F.2d 781, 784 (5th Cir.1989) (stating that administrative agency was not compelled to disclose documents in its possession because "[q]uite simply, the right to speak and publish does not carry with it an unrestricted license to gather information"); *Capital Cities Media, Inc. v. Chester,* 797 F.2d 1164, 1167–76 (3d Cir.1986) (examining the text and history of the First Amendment and concluding that there is no First Amendment right of access to state administrative agency records); *McGehee v. Casey,* 718 F.2d 1137, 1147 (D.C.Cir.1983) ("As a general rule, citizens have no first amendment right of access to traditionally nonpublic government information."); *Norwood v. Slammons,* 788 F.Supp. 1020, 1027 (W.D.Ark.1991) (holding that FERPA does not violate the First Amendment because "*there is no constitu-*

*tional right of general public access to the disciplinary or investigatory records of a post-secondary educational institution*") (emphasis added); *Gartner v. United States Information Agency,* 726 F.Supp. 1183, 1188 (S.D.Iowa 1989) (stating that "it is one thing to say that the government may not restrict the plaintiffs from telling the news to their readers, and quite another to argue that the government has a constitutional duty to supply the plaintiffs with news to write about[,]" and continuing by noting "[i]t is for Congress to establish the extent of access to the government documents; the first amendment does not do so."); *Herald Co. v. McNeal,* 511 F.Supp. 269, 273 (E.D.Mo.1981) (holding that "plaintiff has no constitutional right of access to the [police records] it now seeks[,]" and that "[t]he Constitution is not a 'Freedom of Information Act' ").

The Court's refusal to recognize a First Amendment right of access to student disciplinary records is grounded in logic as well as precedent. Setting the scope of access to government records is a legislative matter that does not implicate First Amendment principles. As Justice Stewart stated:

> "There is no constitutional right to have access to particular government information, or to require openness from the bureaucracy. The public's interest in knowing about its government is protected by the guarantee of a Free Press, but the protection is indirect. The Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act."

> "The Constitution, in other words, establishes the contest, not its resolution. Congress may provide a resolution, at least in some instances, through carefully drawn legislation. For the rest, we must rely, as so often in our system we must, on the tug and pull of the political forces in American Society."

*Houchins v. KQED, Inc.,* 438 U.S. 1, 14–15, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978)

(quoting Stewart, "Or of the Press," 26 Hastings L.J. 631, 636 (1975)); *see also Capital Cities Media*, 797 F.2d at 1168–71 (discussing how the inner-workings of Government have traditionally been conducted behind closed doors and noting that "decisions as to how much governmental information must be disclosed in order to make democracy work historically have been regarded as political decisions to be made by the people and their elected representatives"). Indeed, Congress and state legislatures have enacted numerous Freedom of Information Acts and Sunshine Acts.

To hold that the First Amendment compels disclosure of government-held information would render these federal and state freedom of information statutes meaningless by supplanting them with what essentially would be a constitutional Freedom of Information Act. This would leave the courts with the task of fashioning the scope of a constitutional right of access without any principled basis or standard to use for assistance. The Supreme Court acknowledged this dilemma in *Houchins:*

> There is no discernable basis for a constitutional duty to disclose, or for standards governing disclosure of or access to information. Because the Constitution affords no guidelines, absent statutory standards, hundreds of judges would, under the Court of Appeals' approach, be at large to fashion ad hoc standards, in individual cases, according to their own ideas of what seems "desirable" or "expedient." We, therefore, reject the Court of Appeals' conclusory assertion that the public and the media has a First Amendment right to government information regarding the conditions of jails and their inmates and presumably all other public facilities such as hospitals and mental institutions.

*Houchins*, 438 U.S. at 14, 98 S.Ct. 2588; *see also Capital Cities Media*, 797 F.2d at 1171 ("Neither the free speech clause nor the structure of the government described by the Constitution yields any principled basis for deciding which government infor-

mation must be made available to the citizenry and which need not."). Accordingly, it is wise to leave to the legislative branch the issue of what information the government must publicly disclose.

The Court notes that the Supreme Court has recognized a First Amendment right of access to criminal trials and related criminal proceedings. *See Richmond Newspapers v. Virginia*, 448 U.S. 555, 580, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (finding an implicit First Amendment right to attend criminal trials); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 602, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (holding that state statute prohibiting public from criminal trials of specified sexual offenses involving a victim under the age of 18 violated the First Amendment); *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 505, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (Press–Enterprise I) (holding that First Amendment right of public access to criminal trials extends to voir dire proceedings); *Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 10, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (Press–Enterprise II) (extending the First Amendment right of access to criminal preliminary hearings). In these cases, the Supreme Court reasoned that the First Amendment protected access to criminal trials because such trials historically have been open to the public and because a right of access plays a significant positive role in the functioning of the criminal trial process. *See, e.g., Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 605–06, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982).

However, the Supreme Court has not extended this right of access outside the realm of criminal trials and related criminal proceedings. *See Globe Newspaper Co.*, 457 U.S. at 611, 102 S.Ct. 2613 (O'Connor, J., concurring) (stating that "neither Richmond Newspapers nor the Court's decision today carry any implications outside the context of criminal trials"); *El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 495 (1st Cir.1992) ("[W]e seriously question

whether Richmond Newspaper and its progeny carry positive implications favoring rights of access outside the criminal justice system."); *Calder v. IRS*, 890 F.2d 781, 783 (5th Cir.1989) (declining to extend Richmond line's right of access to administrative agency documents). Therefore, the Court believes that *Richmond* and its progeny only apply when criminal proceedings are involved, and that *Houchins* applies to other types of government information. *See Capital Cities Media*, 797 F.2d at 1173 (stating that the *Richmond* line of cases do not expressly or impliedly overrule *Houchins* ).

The instant case involves records of student disciplinary proceedings. These proceedings are not criminal in nature as they only regulate the relationship between the student and the university, and have no bearing on a student's legal rights or obligations under state or federal criminal laws. *See* Miami University Code of Student Conduct, Plaintiff's Ex. 7 to Motion for Summary Judgment ("If a student breaks a law that also violates University standards of conduct, that student may be held accountable by both civil authorities and the University."); The Ohio State University Code of Student Conduct, Plaintiff's Ex. 8 to Motion for Summary Judgment (stating that "students also are subject to city, county, state, and federal law" and "[t]herefore, legal action in addition to university disciplinary action may occur"); *cf. DTH Publishing Corp. v. University of North Carolina*, 128 N.C.App. 534, 496 S.E.2d 8, 15 (1998) (stating that University of North Carolina's "sanctions are limited in scope in that they only regulate students' relationship with the University and do not have any dispositive impact on students' legal rights in the larger community."). In fact, university disciplinary proceedings do not provide students with many of the procedural due process protections that criminal defendants are afforded. *See, e.g., Osteen v. Henley*, 13 F.3d 221, 225–26 (7th Cir. 1993) (holding that student's due process rights at university disciplinary proceeding did not include the right to have counsel present at the proceeding, because "[t]o recognize such a right would force student disciplinary proceedings into the mold of adversary litigation"); *Jenkins v. Louisiana State Bd. of Educ.*, 506 F.2d 992, 1000 (5th Cir.1975) (noting that the standards of due process applicable to university disciplinary proceedings are "not to be equated with that essential to a criminal trial and the notice of charges need not be drawn with the precision of a criminal indictment"); *Nash v. Auburn Univ.*, 621 F.Supp. 948, 953 (M.D.Ala.1985) (stating that "procedural due process in the context of a school disciplinary proceeding does not require all the trappings or procedural safeguards of a criminal trial"); *Jaksa v. Regents of Univ. of Michigan*, 597 F.Supp. 1245, 1250 (E.D.Mich.1984) (stating that "a school disciplinary proceeding is not a criminal trial, nor is a student accused of cheating entitled to all the procedural safeguards afforded criminal defendants"). Accordingly, this Court declines to extend *Richmond* and its progeny to Defendants' student disciplinary records.

Even if the Court were to apply the principles from the *Richmond* line of cases, it would not affect the Court's conclusion that the public does not enjoy a First Amendment right of access to Defendants' student disciplinary records. The right of access articulated in *Richmond, Globe* and the *Press–Enterprise* I and *Press–Enterprise II* cases is not absolute. *See Press–Enterprise II*, 478 U.S. at 9, 106 S.Ct. 2735. Rather, the Supreme Court has stated that for the First Amendment right of access to apply, two factors must be present. First, the court must determine whether the information sought has "historically been open to the press and general public." *Id.* at 8, 106 S.Ct. 2735. Second, the court must determine whether "public access plays a significant positive role in the functioning of the particular process in question." *Id.* at 8–9, 106 S.Ct. 2735. If the information or proceeding in

question "passes these tests of experience and logic, a qualified First Amendment right of public access attaches." *Id.* at 9, 106 S.Ct. 2735. The qualified right can be overcome only by the government showing that an overriding interest requires restricted access, and that the restriction is narrowly tailored to serve that interest. *See id.* at 9–10, 106 S.Ct. 2735; *see also United States v. Gonzales,* 150 F.3d 1246, 1256 (10th Cir.1998), *cert. denied,* 525 U.S. 1129, 119 S.Ct. 918, 142 L.Ed.2d 915 (1999); *Capital Cities Media,* 797 F.2d at 1174.

Applying the Supreme Court's two-pronged test to this case, the Court concludes that no First Amendment right of access arises. First, Defendants and *The Chronicle* have not made any argument nor presented any evidence that university disciplinary proceedings and records traditionally have been open to the public. And the fact that FERPA has been in existence for approximately twenty-six years supports the assumption that such proceedings and records do not have a tradition of openness.

Second, Defendants and *The Chronicle* have not shown that requiring university disciplinary proceedings and records to be open to the public would play a significant positive role in the functioning of such proceedings. In fact, it is possible that requiring access to disciplinary records would be detrimental to the functioning of disciplinary proceedings. For example, opening these records to the public could force universities to afford students more due process protections in the disciplinary process. University disciplinary proceedings are not criminal trials; rather, they are meant to safeguard a universities' primary purpose, which is to educate its students. *See Board of Curators v. Horowitz,* 435 U.S. 78, 88, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) ("A school is an academic insti-

tution, not a courtroom or administrative hearing room."); *Goss v. Lopez,* 419 U.S. 565, 583, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (refusing to impose too many due process requirements on disciplinary proceedings because "further formalizing the suspension process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process"); *Osteen v. Henley,* 13 F.3d 221, 225–26 (7th Cir.1993); *Jenkins v. Louisiana State Bd. of Educ.,* 506 F.2d 992, 1004 (5th Cir.1975) (stating that university regulations "ask for adherence to standards of conduct which befit a student [and] enhance the educational purposes of the school[.]"); *Jaksa v. Regents of University of Michigan,* 597 F.Supp. 1245, 1250 (E.D.Mich.1984). Therefore, *requiring more openness and increased formality would make disciplinary proceedings more costly and could hinder their effectiveness* as a mechanism for safeguarding the educational atmosphere of colleges and universities. *See Goss,* 419 U.S. at 583, 95 S.Ct. 729; *Osteen,* 13 F.3d at 225–26; *Jaksa,* 597 F.Supp. at 1250. Additionally, victims and students in general may be less inclined to report violations of university regulations or to pursue the disciplinary process if they know that any disciplinary proceedings that ensue will be open to the public.[24]

In sum, the Court holds that FERPA does not violate the First Amendment. The citizenry does not possess a First Amendment right of access to the disciplinary records of public universities. It is a legislative decision as to where the balance between access and privacy must be struck.

**2. Irreparable Harm and Adequate Legal Remedy**

■■■ As stated above, one of the purposes for enacting FERPA was "to protect

---

**24.** The Court is providing these reasons merely as examples of the possible damaging effects public access could have on the university disciplinary process. On the other hand, one may be able raise arguments that more

openness would improve the university disciplinary process. However, in this case, neither *The Chronicle* nor Defendants have presented any arguments to that effect.

[students'] rights to privacy by limiting the transferability of their records without their consent." *Joint Statement,* 120 Cong.Rec. 39858, 39862 (Dec. 13, 1974). Defendants' continued release of student disciplinary records clearly will injure this privacy interest that Congress sought to protect. Additionally, the United States has an interest in ensuring that recipients of federal funds pursuant to a grant agreement comply with the terms and conditions attached to the grant. In this case, both Defendants signed agreements with the Department of Education promising to comply with FERPA in exchange for federal funds. Defendants' release of student disciplinary records in violation of FERPA breaches the terms of their agreements with the Department, and consequently, damages the interests of the Department and the United States.

The Court's inquiry as to whether the Plaintiff will suffer irreparable harm is intertwined with the issue of whether there exists an adequate remedy at law. If a Plaintiff cannot get redress for its injuries through alternate legal remedies, it follows that it will suffer irreparable harm.

In this case, *The Chronicle* argues that Plaintiff has adequate remedies at law in the form of administrative remedies. Specifically, *The Chronicle* submits that if Plaintiff believes Defendants are violating FERPA it can (1) withhold funds from Defendants, (2) issue cease and desist orders, or (3) enter into compliance agreements with Defendants. *See* 20 U.S.C. § 1234c.

As an initial matter, the Court reiterates that Congress has expressly authorized the Secretary of Education to "take any other action authorized by law with respect to the recipient" in order to enforce FERPA. 20 U.S.C. § 1234c(a)(4). There is no requirement that the Secretary resort to the administrative remedies first; the Secretary has the option to choose the method of enforcement best suited for the situation.

Moreover, none of the three administrative remedies available to the Department would provide an adequate remedy in this case. First, withholding funds from Ohio State University and Miami University would decrease university resources, and thus, would hurt the students for whom FERPA was designed to protect. Furthermore, there would be no guarantee such action would compel Defendants to comply with FERPA.

Second, issuing a cease and desist order would not be adequate to restrain Defendants' from releasing student disciplinary records without consent. Under the enforcement provisions relating to FERPA, a cease and desist order is not self-executing. Rather, the Department can only enforce such an order by withholding funds or by referring the matter to the Attorney General for enforcement. *See* 20 U.S.C. § 1234e(e)(1) and (2). Therefore, absent additional enforcement measures, a cease and desist order under § 1234e merely serves as notice to the fund recipient that the Department considers the recipient's actions to be in violation of FERPA. Similarly, a compliance agreement would be inadequate because Defendants cannot be compelled to enter into such an agreement. *See* 20 U.S.C. § 1234f.

Finally, the Court notes that the Ohio Supreme Court's opinion, in *State ex. rel. The Miami Student v. Miami University,* 79 Ohio St.3d 168, 680 N.E.2d 956 (1997), has made any administrative remedy inadequate. By interpreting FERPA to exclude student disciplinary records, the Ohio Supreme Court has forced Defendants to release such records under the Ohio Public Records Act, Ohio Rev.Code § 149.43. Agency interpretations of FERPA to the contrary will have no effect. Indeed, that is why this lawsuit was filed in the first place.

Accordingly, the only adequate remedy available in this case is a federal court order interpreting FERPA to cover student disciplinary records, and enjoining

Defendants from releasing such records, except as permitted under FERPA.

### 3. Harm to Third Parties and Public Interest

*The Chronicle* and Amici in Opposition to Plaintiff argue that university students, prospective students and parents are substantially harmed when universities are prohibited from releasing disciplinary records. Specifically, they submit that the public interest in receiving information is at its highest when issues of personal safety and the prevention of crime are involved.

The Court agrees that matters involving personal safety and prevention of crime are important public issues. Nonetheless, these interests will not be harmed by an injunction in this case. The public's interest in receiving information about crime on college campuses is satisfied even without being able to access personally identifiable information in student disciplinary records. As part of the Student Right–to–Know Act, Congress requires universities to publish statistics concerning the occurrence of various crimes committed on campus, such as murder, rape, robbery, aggravated assault, liquor-law violations, drug-abuse violations and violent hate crimes. *See* 20 U.S.C. § 1092(f); 34 C.F.R. § 668.47. The Court believes that these disclosures are adequate to inform students, prospective students and parents about the safety of various college campuses. Releasing the personally identifiable information of the students accused or convicted of violating university regulations, as well as information about the victims, would not further advance the public's interest. Moreover, many offenses that constitute university code violations will also be charged under state or federal criminal laws. The information concerning those crimes, including any personally identifiable information regarding the accused or the victims, often will be available to the public.

In sum, the Court believes that the harm to third parties—specifically, students, prospective students, and parents—that may arise from an injunction enforcing FERPA is slight. Additionally, the public, while certainly benefitting from laws that promote openness in public records, also benefits from the privacy accorded students through FERPA. Congress, through FERPA, has balanced the interests of privacy versus public disclosure and the Court is in no position to second guess it.

### V. Conclusion

Based on the above, the Court finds that the student disciplinary records of Defendants Ohio State University and Miami University are education records as defined in FERPA, 20 U.S.C. § 1232g(a)(4)(A). Furthermore, the Court finds that Defendants have violated FERPA by releasing student disciplinary records and personally identifiable information contained therein to third parties without student or parental consent. Accordingly, Plaintiff's motion for summary judgment is **GRANTED**. Defendants are hereby **PERMANENTLY ENJOINED** from releasing student disciplinary records or any "personally identifiable information" contained therein, as defined in FERPA and its corresponding regulations, except as otherwise expressly permitted under FERPA.

**IT IS SO ORDERED.**